# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LPPAS REPRESENTATIVE, LLC, in its capacity as authorized agent and representative of Luis Perez, Gerardo Necuze, and Manuel Enriquez, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0241-KSJM |
| ATH HOLDING COMPANY, LLC, and HIGHLAND ACQUISITION HOLDINGS, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, solely in its capacity as HealthSun Sellers' Representative, | ) ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2020-0443-KSJM |
| ATH HOLDING COMPANY, LLC and HIGHLAND ACQUISITION HOLDINGS, LLC, | ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted:  January 4, 2023
Date Decided:  May 2, 2023

Kelly L. Freund, Michelle Morgan, DLA PIPER LLP, Wilmington, Delaware; *Counsel for Plaintiff LPPAS Representative, LLC.*

A. Thompson Bayliss, E. Wade Houston, Peter C. Cirka, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Shareholder Representative Services LLC*.

Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Thomas Uebler, McCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Glenn M. Kurtz, Elizabeth Stainton, WHITE & CASE LLP, New York, New York; *Counsel for Defendants and Counterclaim Plaintiffs ATH Holding Company, LLC and Highland Acquisition Holdings LLC*.

**McCORMICK, C.**

This is the latest installation in a dispute arising from an Equity Interests Purchase Agreement (the "Purchase Agreement") between health insurance providers and healthcare companies. Under Section 10.6 of the Purchase Agreement, the sellers agreed to indemnify the buyer and its parent company for losses arising from certain third-party claims. As to third-party claims brought by government regulators, the Purchase Agreement granted the indemnifying parties the right to participate in the defense strategy.

In 2018, Anthem, the buyer, discovered what it believed to be fraudulent coding practices that the sellers had perpetrated to receive excessive Medicare Advantage reimbursement from the Center for Medicare and Medicaid Services ("CMS"). Anthem reported the information to CMS and the United States Department of Justice ("DOJ"). Anthem later had discussions concerning liability and executed tolling agreements with both agencies. Anthem then noticed indemnification claims relating to the CMS and DOJ investigations, but it did not contact the sellers to allow them to participate in the defense.

The sellers' representatives, who are the plaintiffs in these actions, have moved for partial summary judgment. They argue that the buyer breached their participation rights by unilaterally steering the defense of the DOJ and CMS claims. There are two plaintiffs— the "HealthSun Plaintiff" and the "Pasteur Plaintiff." Both seek a declaratory judgment that Anthem breached their participation rights and request contractual fee-shifting under the Purchase Agreement. The Pasteur Plaintiff seeks additional relief. The parties have a complex escrow arrangement to fund the sellers' indemnification obligations, which this court has described in more detail in prior decisions. The Pasteur Plaintiff argues that

Anthem's breach of the participation rights requires that Anthem release what funds remain in escrow.

This decision grants the plaintiffs' motions for summary judgment in part, finding that the buyer breached the plaintiffs' participation rights and that the plaintiffs are entitled to fee-shifting for that breach. This decision denies the Pasteur Plaintiff's motion for escrow relief in light of a potentially valid claim against the remaining escrow funds.

## I. FACTUAL BACKGROUND

The background is drawn from the undisputed facts, which are stated in the materials attached to the parties' briefing on the motions for partial summary judgment.

### A. The Purchase Agreement And Escrow Agreement

Under the Purchase Agreement,[1] Defendant Highland Acquisition Holdings, LLC (the "Buyer" or "Highland") acquired two groups of Florida-based entities (the "Pasteur Entities" and the "HealthSun Entities," and together, the "Entities") from their respective owners (the "Pasteur Sellers" and the "HealthSun Sellers," and, together, the "Sellers").

The Entities operate as an integrated health plan, medical center network, and pharmacy.[2] The HealthSun Entities include a Medicare Advantage Organization ("MAO") that maintains networks of medical providers to service its Medicare-eligible enrollees.[3]

---

[1] C.A. No. 2020-0443-KSJM (the "HealthSun Action"), Docket ("Dkt.") 172, Transmittal Aff. of E. Wade Houston ("Houston Aff."), Ex. 2 ("Purchase Agreement"); *see also* C.A. No. 2020-0241-KSJM (the "Pasteur Action"), Dkt. 1 ("Pasteur Compl."); HealthSun Action, Dkt. 18 ("HealthSun Answer") ¶ 9.

[2] Purchase Agreement at 2; *see also* Pasteur Action, Dkt. 28 ("Schlegel Decl.") ¶ 3; HealthSun Answer ¶¶ 25–30.

[3] HealthSun Answer ¶¶ 25–27.

2

Highland's acquisition of the Entities closed in November 2016.[4]   Anthem bought

Highland in 2017 and now owns the Entities.[5]

The Purchase Agreement obligated the Sellers to indemnify the Buyer and its

successors for any "Losses" arising from breaches or inaccuracies in the Sellers'

representations or warranties.[6]   All of the representations and warranties at issue are

classified in the Purchase Agreement as "Specified Health Care Representations and

Warranties" (the "Specified Representations"), under which the Sellers represented that the

Entities had complied in all material respects with certain healthcare laws.[7]

To secure the Sellers' indemnification obligations under the Purchase Agreement,

Highland deposited $100 million of the purchase price into escrow.[8]  That amount provided

a cap on indemnification claims arising from breaches or inaccuracies in the Specified

Representations.[9]

---

[4] Schlegel Decl. ¶ 2; HealthSun Action, Dkt. 1 ("HealthSun Compl.") ¶ 10; HealthSun Answer ¶ 10.

[5] Schlegel Decl. ¶ 4; HealthSun Answer at 1 n.1.

[6] Purchase Agreement § 10.3(a).

[7] *Id.* § 10.2(a); *see also id.* §§ 2.13(e), (g), (h), (i), (l), (m).  The Purchase Agreement defines "Health Care Representations and Warranties" as the representations and warranties "set forth in Sections 2.13(e) through 2.13(m)." *Id.* at A-8 (emphasis omitted).  The Specified Representations, as defined in § 10.2(a), are the representations and warranties "set forth in Sections 2.13(e), 2.13(g), 2.13(h), 2.13(i), 2.13(l), 2.13(m) solely with respect to" certain regulatory compliance claims.  *Id.* § 10.2(a) (emphasis omitted).

[8] *Id.* § 1.3(d)(i).

[9] *Id.* § 10.2(c).

3

The parties agreed that the escrow funds would be released as governed by a November 30, 2016 Escrow Agreement (the "Escrow Agreement").[10] The Purchase Agreement required that the parties enter into the Escrow Agreement, attached the Escrow Agreement as an exhibit, and incorporated it by reference.[11] The Escrow Agreement required that the escrow funds be released over four years.[12] The releases were to be made annually, beginning in 2017, in contractually specified amounts minus any indemnification claims then "pending."[13]

The Purchase Agreement and the Escrow Agreement set out a complicated contractual scheme discussed in greater detail in the legal analysis. The primary right relevant to this decision is found in Section 10.6 of the Purchase Agreement, which governs litigation practices relating to "Third[-]Party Claims" that "may give rise to a claim for indemnification . . . under this Article 10[.]"[14] Under Section 10.6(b), when one party indemnifies the other, "[t]he Indemnifying Person shall . . . have the right to defend the Indemnified Person against the Third[-]Party Claim" subject to certain conditions not

---

[10] *Id.* § 1.3(d); *see also* Pasteur Action, Dkt. 9 ("Freund Aff."), Ex. B (Escrow Agreement); HealthSun Compl. ¶ 10 & Ex. 2 (Escrow Agreement); HealthSun Answer ¶ 10.

[11] *See* Purchase Agreement at 3 (stating that the Purchase Agreement is contingent on the parties entering into the Escrow Agreement); *id.* § 11.16 (incorporating the recitals as material provisions); *id.* § 11.13 (incorporating all schedules and exhibits by reference); *id.* at A-19 (adopting the Escrow Agreement as a related agreement).

[12] *See* Escrow Agreement §§ 6(a)–(d).

[13] *Id.*

[14] Purchase Agreement § 10.6(a) (underline in original).

directly relevant here.[15]  In other words, Section 10.6(b) gives the indemnifying party rights to control the defense of third-party litigation (the "Control Rights").

Section 10.6(b) contained an exception for "Regulatory Claim[s]" that "involve[] a Governmental Authority or Health Care Law[.]"[16]  In the case of Regulatory Claims, in lieu of Control Rights, Section 10.6(c) grants the indemnifying party the right to participate in the defense of the Third-Party Claim in various ways (the "Participation Rights").  The Participation Rights are discussed in greater detail in the legal analysis.[17]

### B.     Regulators Begin Examining Anthem And Anthem Launches An Internal Investigation.

As early as March 2018, the DOJ began investigating Anthem in connection with its submission of risk adjustment claims to CMS for Medicare reimbursement.[18]  As an MAO, Anthem—and the Highland subsidiaries it acquired—may seek reimbursement from CMS for coverage provided to Medicare-eligible beneficiaries.[19]

In as simplified terms as possible, reimbursement under Medicare Advantage works as follows: first, a beneficiary receives a diagnosis from a healthcare provider; second, the

---

[15] *See id.* § 10.6(b).

[16] See *id.*

[17] *See id.* § 10.6(c).

[18] *See* HealthSun Action, Dkt. 172 ("HealthSun Pl.'s Opening Br."), Ex. 3 (*United States v. Anthem, Inc.*, 18-MC-379 (Nov. 13, 2018)) at 1 (Report and Recommendation of Kevin Nathaniel Fox, United States Magistrate Judge recommending that the court grant the DOJ's petition to compel testimony in response to the DOJ's Civil Investigative Demand ("CID")) [*hereinafter* "Report and Recommendation"].

[19] *See* HealthSun Pl.'s Opening Br., Ex. 10 at 1; *see also* Report and Recommendation at 1 (stating that Anthem participates in the applicable Medicare Advantage program).

healthcare provider submits service information to the MAO; third, the MAO submits a record of the service to CMS, including relevant data submissions; fourth, CMS reviews the submission, checks the integrity of the data provided, and identifies "risk-adjustment-eligible" diagnoses; and fifth, CMS pays the MAO a risk-adjusted payment.[20] After submitting reimbursement data in the form of code, MAOs may make corrections after the fact to account for errors.[21]

The structure of the Medicare Advantage program creates a financial incentive for MAOs to portray their beneficiaries as sicker than they are, and the federal government monitors MAOs for fraud of this nature. CMS adjusts its payment for the beneficiary's risk because sicker beneficiaries are likely to need greater amounts of care, thus generating higher medical costs than healthier beneficiaries. CMS determines an MAO enrollee's risk score based on demographics and hierarchical condition categories ("HCCs"), which are categories of clinically related diagnoses that bear on costs of treatment.[22] And the total risk-adjusted payment to an MAO for an enrolled beneficiary equals the risk score multiplied by the Medical Advantage plan's base payment rate.[23] Therefore, to obtain

---

[20] *See* HealthSun Pl.'s Opening Br., Ex. 10 at 2 (chart explaining process).

[21] *See* 42 C.F.R. § 422.310(g)(2)(i) ("Prior to calculation of final risk factors for a payment year, CMS allows a reconciliation process to account for risk adjustment data submitted after the March deadline until the final risk adjustment data submission deadline in the year following the payment year."); *id.* § 422.310(g)(2)(ii) ("After the final risk adjustment data submission deadline, which is a date announced by CMS that is no earlier than January 31 of the year following the payment year, an MA organization can submit data to correct overpayments but cannot submit diagnoses for additional payment.").

[22] HealthSun Pl.'s Opening Br., Ex. 10 at 3–4.

[23] *Id.*

6

higher payments, MAOs are incentivized to make beneficiaries appear as sick as possible.[24] Accordingly, the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG") monitors coding submissions from MAOs for potentially fraudulent data that exaggerates the sickness of Medicare Advantage beneficiaries.[25]

Before Anthem purchased the Entities, HealthSun had audited Pasteur in 2016 relating to its Medicare Advantage reimbursement practices (the "2016 Audit"). In the 2016 Audit, HealthSun found what it believed to be numerous instances of misconduct relating to code submissions to CMS (the "Coding Misconduct").[26] By 2018, Anthem had learned of the Coding Misconduct and came to believe that HealthSun and Pasteur had failed to correct prior data submissions for the errors detected in the 2016 Audit.[27]

## C. Anthem Asserts Three Indemnification Claims Prior To The 2019 Release.

In the twelve months prior to the 2019 escrow release, Anthem provided the Sellers with notice of three claims for indemnification as to losses for breaches or inaccuracies in the Specified Representations.

---

[24] *Id.* at 1.

[25] *See id.*

[26] *See, e.g.*, HealthSun Pl.'s Opening Br., Ex. 13 at 2.

[27] *See* HealthSun Pl.'s Opening Br., Ex. 17, Attach. 2, at 3.

Anthem made the first claim in the amount of $5 million on June 28, 2019,[28] and the second claim in the amount of $800,000 on November 1, 2019.[29] The third claim, which was also provided on November 1, 2019,[30] asserted losses in connection with Civil Investigation Demands (the "CIDs") that Anthem received from the DOJ regarding the ongoing investigation. The notice stated that "the amount of Loss is currently unknown" but concluded that the Loss "could well exceed the materiality standard ($14,675,000)."[31]

Anthem noticed a claim against the escrow funds in connection with each of the indemnification claims on November 25, 2019, instructing the Escrow Agent to withhold the Disputed Funds.[32] The Escrow Agent did.

### D. Subsequent Events Eliminate The Basis For Anthem's Third Indemnification Claim.

On March 26, 2020, the DOJ filed a complaint in the United States District Court for the Southern District of New York against Anthem for violations of the False Claims Act.[33] The complaint did not name the Entities as parties. This development eliminated

---

[28] Pasteur Action, Dkt. 28 ("Toscano Decl."), Ex. 13 ("First Indemnification Notice"); HealthSun Compl. ¶ 104 & Ex. 21 (First Indemnification Notice); HealthSun Answer ¶ 104.

[29] Toscano Decl., Ex. 15 ("Second Indemnification Notice"); HealthSun Compl. ¶ 113 & Ex. 24 (Second Indemnification Notice); HealthSun Answer ¶ 113.

[30] Toscano Decl., Ex. 19 ("Third Indemnification Notice"); HealthSun Compl. ¶ 120 & Ex. 25 (Third Indemnification Notice); HealthSun Answer ¶ 120.

[31] Third Indemnification Notice at 1.

[32] Toscano Decl., Ex. 20 ("Escrow Notice"); HealthSun Compl. ¶ 135 & Ex. 28 (Escrow Notice); HealthSun Answer ¶ 135.

[33] Freund Aff., Ex. I; HealthSun Compl. ¶ 144; HealthSun Answer ¶ 144.

the basis for Anthem's third indemnification claim, and Anthem withdrew its request for indemnification from the Sellers based on the third indemnification claim.[34]

### E. The Pasteur Plaintiff Files Litigation.

The Pasteur Plaintiff, as representative of the Pasteur Sellers, filed suit against Defendants ATH Holding Company, LLC and Highland Acquisition Holdings, LLC (together, "Defendants" or "Anthem") on March 31, 2020, claiming that Defendants breached the Purchase Agreement and Escrow Agreement by withholding the disputed funds and seeking specific performance, declaratory relief, and attorneys' fees.[35]

### F. Anthem Asserts A New Indemnification Claim.

On April 16, 2020, Anthem sent the Sellers notice of an additional indemnification claim.[36] It stated that, in February 2019, Anthem received a whistleblower report from a terminated employee.[37] The report alleged fraudulent and improper coding practices by the Pasteur Entities, buttressing Anthem's suspicions of wrongdoing following the 2016 Audit.[38] The report prompted Anthem to conduct an internal investigation, which supposedly unearthed wrongdoing in the Entities' code reporting that predated Highland's

---

[34] *See* Pasteur Action, Dkt. 27 at 26; HealthSun Action, Dkt. 43 at 21.

[35] *See* Pasteur Action, Dkt. 1.

[36] Toscano Decl., Ex. 12 ("Fourth Indemnification Claim"); Toscano Decl., Exs. 1, 9, 10, 22 (attachments to the Fourth Indemnification Claim); HealthSun Compl. ¶ 152 & Ex. 37 (Fourth Indemnification Claim); HealthSun Answer ¶ 152. Pincites to the attachments to the Fourth Indemnification Claim are to the version of that document attached as Exhibit 37 to the HealthSun Complaint.

[37] Fourth Indemnification Claim at 2.

[38] *Id.* at 2–3.

acquisition of the Entities.[39]  The notice provided both anecdotal evidence of improper diagnosis coding and documentary evidence of the conduct to which it referred.[40]

Anthem claimed that improper coding erroneously inflated the Entities' 2017 EBITDA, which was used to generate the purchase price under the Purchase Agreement.[41]  Because it estimated that the identified practices inflated the Entities' 2017 EBITDA by $10.01 million, and because the Entities' 2017 EBITDA was multiplied by 14.5 to calculate the purchase price, Anthem's notice claimed damages of $145.145 million.[42]  Together with the damages it estimated to incur from correcting the coding errors, Anthem's notice asserted total losses up to $173.645 million arising out of the breaches of the Specified Representations.[43]

### G.  Anthem Self-Reports The Misconduct To CMS And The DOJ.

On April 2, 2020, around the same time that it asserted various claims against the Sellers, Anthem self-reported its internal investigation to CMS.[44]  Anthem determined that it would "need to submit data corrections for certain diagnosis codes to CMS" on a rolling basis.[45]  Anthem sent a second letter to CMS on April 2, 2021, regarding the Coding

---

[39] *Id.* at 1.

[40] *Id.* at 3–4, 10–29.

[41] *Id.* at 7.

[42] *Id.*

[43] *Id.*

[44] HealthSun Pl.'s Opening Br., Ex. 12 (April 2, 2020 letter from Anthem to CMS).

[45] *Id.*

10

Misconduct. The court refers to the interactions between Defendants and CMS as the "CMS Investigation."

At some point before April 16, 2020, Anthem also discussed the Coding Misconduct with the DOJ's criminal division ("DOJ Criminal").[46] This decision refers to those interactions as the "DOJ Criminal Investigation." On August 26, 2021, Anthem, the DOJ's civil division ("DOJ Civil"), and the OIG entered into a tolling agreement as to the statute of limitations on any civil liability (the "Tolling Agreement").[47] Anthem discussed the Coding Misconduct with DOJ Civil on August 30, 2021.[48] This decision refers to the interactions between DOJ Civil and Defendants as the "DOJ Civil Investigation" and, together with the DOJ Criminal Investigation, the "DOJ Investigations." The court refers to all three investigations together as the "Investigations."

### H. The HealthSun Plaintiff Files Litigation.

The HealthSun Plaintiff, as representative for the HealthSun Sellers, filed a separate action on June 5, 2020, alleging breach of contract for refusal to release the disputed funds and seeking contractual fee-shifting.[49]

### I. Subsequent Procedural History

The Pasteur Plaintiff moved for partial summary judgment and the HealthSun Plaintiff moved for judgment on the pleadings on May 11, and August 6, 2020,

---

[46] HealthSun Pl.'s Opening Br., Ex. 13 at 8.

[47] *See* HealthSun Pl.'s Opening Br., Ex. 19.

[48] *See* HealthSun Action, Dkt. 183 ("Defs.' Answering Br.") at 43 (representing that this meeting occurred); *see also* Pasteur Action, Dkt. 102 at 43 (same).

[49] *See* HealthSun Compl.

11

respectively.[50] The court issued a decision on December 29, 2020.[51] The decision ruled in Plaintiffs' favor in part, holding that Anthem's fourth indemnification notice did not "relate back" to the first and that Anthem was required to reach a contractual materiality standard in order to block the release of the disputed funds. The decision, therefore, ordered Anthem to release the difference between the $13 million in disputed funds and the $5.8 million in losses timely noticed in Anthem's first two indemnification claims.[52]

The decision also denied Plaintiffs' motion in part, holding that the contractual materiality standard was ambiguous as to whether Anthem's first and second claim notices totaling $5.8 million continued to meet the materiality standard.[53]

The parties engaged in discovery on the unresolved issue. On April 30, 2021, after the conclusion of document discovery, the HealthSun Plaintiff moved for summary judgment, seeking a declaration that Plaintiffs' interpretation of the materiality standard was correct, an order compelling Anthem to release the remaining disputed funds, and an award of attorneys' fees.[54] The Pasteur Plaintiff moved for summary judgment on June 17, 2021, seeking the same relief.[55]

---

[50] HealthSun Action, Dkt. 24; Pasteur Action, Dkt. 9.

[51] *See LPPAS Rep., LLC v. ATH Hldg. Co., LLC*, 2020 WL 7706937 (Del. Ch. Dec. 29, 2020).

[52] *Id.* at *15.

[53] *Id.*

[54] *See* HealthSun Action, Dkt. 70.

[55] *See* Pasteur Action, Dkt. 65.

On July 9, 2021, in lieu of responding to the summary judgment motions, Anthem agreed to release the remaining $5.8 million at issue.[56] To date, all disputed funds have now been released.[57] The parties have represented, however, that Anthem continues to withhold the approximately $20 million that was scheduled for release on December 1, 2020 (the "2020 Release").[58] The parties also dispute Plaintiffs' entitlement to fees. Anthem has taken the position that "Plaintiffs have not proved that Anthem breached the [Purchase Agreement] or any related agreement and are therefore not entitled to fees."[59]

The parties engaged in a brief but spirited letter-writing campaign to the court, debating the effect of Anthem's release of the disputed funds and Anthem's failure to respond to Plaintiffs' summary judgment briefs on Plaintiffs' fee-shifting claim.[60] The court sent a letter to the parties on September 3, 2021, canceling the hearing on the mooted summary judgment motion and ordering the parties to brief Plaintiffs' fee-shifting claim.[61] On October 20, 2021, the court held oral argument on Plaintiffs' fee-shifting claim.[62]

---

[56] HealthSun Action, Dkt. 97, Ex. D.

[57] *See LPPAS Rep., LLC v. ATH Hldg. Co., LLC*, 2022 WL 94610, at *4 (Del. Ch. Jan. 10, 2022) ("The history of these cases has placed the court in an awkward position. All the Disputed Funds have now been released without the court ordering Anthem to do so.").

[58] *Compare* Defs.' Answering Br. at 1 ("The current amount that remains in escrow is roughly $20 million (the '2020 Release')"), *with* Pasteur Action, Dkt. 106 (Pasteur Pl.'s Reply Br.) at 8.

[59] Defs.' Answering Br., Ex. E.

[60] *See* Pasteur Action, Dkt. 75, 76, 77; HealthSun Action, Dkt. 97, 98, 99.

[61] HealthSun Action, Dkt. 100.

[62] Pasteur Action, Dkt. 87; HealthSun Action, Dkt. 111.

Subsequently, the HealthSun Plaintiff and Anthem reached an agreement mooting the HealthSun Plaintiff's fee-shifting claim.[63]

The court resolved the Pasteur Plaintiff's fee-shifting claim in an order dated January 10, 2022.[64] The court held that the Pasteur Plaintiff was entitled to fee-shifting under Section 10.4 of the Purchase Agreement, which requires the Buyer to indemnify the Sellers from losses "incurred or suffered by them incident to, resulting from or in any way arising out of or in connection with any breach . . . of any covenant or agreement applicable to Buyer contained in or pursuant to this Agreement or any Related Agreement."[65] The court reasoned that Anthem had breached the Purchase Agreement and Escrow Agreement by improperly blocking escrow distributions.[66]

On February 4, 2022, the HealthSun Plaintiff filed a supplemental complaint for specific performance (the "HealthSun Supplemental Complaint").[67] In it, the HealthSun Plaintiff asserts three causes of action. In Count I, the HealthSun Plaintiff claims that Defendants breached its Participation Rights by self-reporting and coordinating with the DOJ and CMS.[68] In Count II, the HealthSun Plaintiff claims that Defendants breached Section 4 of the Escrow Agreement by instructing the Escrow Agent to withhold the 2020

---

[63] *See* HealthSun Action, Dkt. 112.

[64] *See ATH*, 2022 WL 94610.

[65] Purchase Agreement § 10.4.

[66] *See ATH*, 2022 WL 94610, at *6–8.

[67] HealthSun Action, Dkt. 120.

[68] *Id.* ¶¶ 88–91.

14

Release.[69]  In Count III, the HealthSun Plaintiff seeks fee-shifting under Section 10.4 of the Purchase Agreement.[70]

On March 15, 2022, the United States moved to intervene and to stay the HealthSun Action, citing confidentiality concerns relating to the DOJ Investigations.[71]  The court granted a partial stay on April 26, 2022, which allowed Anthem to answer the HealthSun Supplemental Complaint and instructed the United States to present an *in camera* affidavit addressing answers to the HealthSun Plaintiff's questions about the meritoriousness of extending the stay.[72]  The court ordered the parties to complete the *in camera* affidavit by August 2022, to aid in its decision whether to extend the stay past the six-month period the United States requested.[73]

On May 23, 2022, the Pasteur Plaintiff also filed a supplemental complaint (the "Pasteur Supplemental Complaint").[74]  The Pasteur Plaintiff asserts three causes of action in the Pasteur Supplemental Complaint.  In Count I, the Pasteur Plaintiff claims that Defendants breached the Purchase Agreement and Escrow Agreement, for which it seeks specific performance of the 2020 Release.[75]  In Count II, the Pasteur Plaintiff also claims that Defendants breached its Participation Rights by self-reporting and coordinating with

---

[69] *Id.* ¶¶ 92–98.

[70] *Id.* ¶¶ 99–102.

[71] HealthSun Action, Dkts. 142–144.

[72] HealthSun Action, Dkt. 170 ("Apr. 26, 2022 Hr'g Tr.") at 61:16–62:4.

[73] *Id.* at 62:5–15.

[74] Pasteur Action, Dkt. 93.

[75] *Id.* ¶¶ 39–44.

15

the DOJ and CMS.[76]  In Count III, the Pasteur Plaintiff seeks fee-shifting under Section 10.4 of the Purchase Agreement.[77]

On June 6, 2022, the HealthSun Plaintiff moved for partial summary judgment on Counts I and III of the HealthSun Supplemental Complaint.[78]  On June 29, 2022, the Pasteur Plaintiff moved for partial summary judgment on Counts II and III of the Pasteur Supplemental Complaint, seeking both the release of the remaining escrow funds due to Defendants' breach of their Participation Rights and fee-shifting.[79]

The parties coordinated briefing in both actions given the substantial overlap in issues presented.  Defendants pressed affirmative defenses of repudiation and substantial compliance.  The court heard oral argument on the motions on January 4, 2023.[80]

## II.  LEGAL ANALYSIS

"A party is entitled to summary judgment under Court of Chancery Rule 56 when that party can show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."[81]  In contract interpretation cases, a court will grant summary judgment either "when the contract in question is unambiguous, or when the extrinsic evidence in the record fails to create a triable issue of material fact and judgment as a matter

---

[76] *Id.* ¶¶ 45–47.

[77] *Id.* ¶¶ 48–50.

[78] HealthSun Action, Dkt. 172.

[79] Pasteur Action, Dkt. 97.

[80] *See* Pasteur Action, Dkt. 111; HealthSun Action, Dkt. 193 ("Jan. 4, 2023 Hr'g Tr.").

[81] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) (citing Court of Chancery Rule 56).

16

of law is appropriate."[82]  "Summary judgment is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[83]

Under Delaware law, a court "will interpret clear and unambiguous terms according to their ordinary meaning."[84]  A contract is unambiguous "if, by its plain terms, the provisions in controversy are reasonably susceptible to only one meaning."[85]  More broadly, the "objective theory of contracts requires that a court 'give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'"[86]  If contract language is facially ambiguous, "a court must look to extrinsic evidence to determine the shared intent of both parties."[87]

Collectively, Plaintiffs' motions raise five issues.  The first four are implicated by both Plaintiffs' motions; the last is raised only by the Pasteur Plaintiff.  First, did any of the Investigations trigger Plaintiffs' Participation Rights?  Second, did Defendants breach the Participation Rights?  Third, do Defendants' affirmative defenses of repudiation or substantial compliance foreclose summary judgment in Plaintiffs' favor?  Fourth, are Plaintiffs entitled to fee shifting?  Fifth, are Plaintiffs entitled to a release of the escrow funds?

---

[82] *GRT, Inc.*, 2012 WL 2356489, at *4 (citations omitted).

[83] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2008).

[84] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

[85] *GRT, Inc.*, 2012 WL 2356489, at *4.

[86] *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *15 (Del. Ch. Feb. 27, 2020) (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citation omitted)).

[87] *GRT, Inc.*, 2012 WL 2356489, at *4.

## A. The DOJ Investigations And CMS Investigation Triggered The Participation Rights.

Plaintiffs argue that the Participation Rights unambiguously allowed it to participate in the defense of the Investigations because each give rise to a "Regulatory" claim under the Purchase Agreement.[88]

The starting place in the contract analysis is with Section 10.6's definition of "Third[-]Party Claims" and "Control Rights." As stated above, Section 10.6(a) provides: "[i]f any third party shall notify an Indemnified Person with respect to any matter (a 'Third[-]Party Claim') which may give rise to a claim for indemnification against an Indemnifying Person under this Article 10, then the Indemnified Person shall promptly notify the Indemnifying Person thereof in writing[.]"[89] Under Section 10.6(b), "[t]he Indemnifying Person shall . . . have the right to defend the Indemnified Person against the Third[-]Party Claim[.]"[90] In other words, Section 10.6(b) gives the Sellers, as indemnifiers, Control Rights over the defense of the Third-Party Claim.

The Purchase Agreement, however, contains a list of exceptions for certain Third-Party Claims that do not trigger the Control Rights. Section 10.6(b) provides:

> Notwithstanding anything contained herein to the contrary, the Indemnifying Person shall not have the right to direct the defense or settlement of any such Third[-]Party Claim (and shall pay the fees, costs, and expenses of counsel retained by the Indemnified Person with respect to), and the Indemnified Person shall be entitled to have sole control over the defense or

---

[88] *See* HealthSun Pl.'s Opening Br. at 34–38.

[89] Purchase Agreement § 10.6(a) (underline in original).

[90] *Id.* § 10.6(b). This provision is subject to additional conditions that are not directly relevant here.

18

settlement of, on behalf of and for the account and risk of (subject to the limitations contained in this Article 10, to the extent applicable), any Third-Party Claim if (A) such Third-Party Claim seeks non-monetary relief (except where non-monetary relief is merely incidental to a primary claim or claims for monetary damages), (B) such Third-Party Claim involves criminal or quasi-criminal allegations, (C) such Third-Party Claim involves a Governmental Authority or Health Care Laws, in each case that is material and adverse to the Indemnified Person or its Affiliates (including, in the case of a Buyer Indemnified Party, the Companies or their respective businesses) (it being agreed that any RADV Claims or CMS Program Audit Claims shall be deemed material and adverse) (a "Regulatory Claim"), (D) such Third-Party Claim involves a claim to which the Indemnified Person reasonably believes an adverse determination would be materially detrimental or injurious to the Indemnified Person, (E) upon petition by the Indemnified Person, an appropriate court rules that the Indemnifying Person failed or is failing to vigorously prosecute or defend such Third[-]Party Claim or (F) it is reasonably likely that the Losses arising from such Third[-]Party Claim and any other pending claims pending for indemnification against the Indemnifying Person will exceed the amount the Indemnified Person will be entitled to recover under this Article 10 as a result of the limitations set forth herein.[91]

Summarized, this section creates six categories of excepted Third-Party Claims to which no Control Rights apply. Relevant here are the two exceptions under Sections 10.6(b)(B) and (C) for "criminal or quasi-criminal allegations" or Third-Party Claims that are "Regulatory Claims[,]" respectively.[92] The Purchase Agreement does not define "criminal or quasi-criminal allegations."[93] The Purchase Agreement defines "Regulatory

---

[91] *Id.* § 10.6(b).

[92] *Id.* § 10.6(b)(B)–(C).

[93] See generally *id.*

19

Claims" as involving "Governmental Authority or Health Care Laws, in each case that is material and adverse to the Indemnified Person or its Affiliates[.]"[94]

Even though Sellers have no Control Rights regarding the defense of Regulatory Claims, Sellers have Participation Rights under Section 10.6(c), which provides:

> If a Third[-]Party Claim is a Regulatory Claim, then (i) the Indemnified Person shall defend against the Regulatory Claim with a nationally-recognized counsel of the Indemnified Person's choice . . . , (ii) the Indemnified Person shall (and shall cause its counsel to) consult regularly (and not less than once per week) with the designated representatives of the Indemnifying Person regarding the status of such matter . . . (iii) all filings or written submissions with the court or Governmental Authority and correspondence with opposing counsel and/or the applicable Governmental Authority shall be subject to reasonable review and comment (not to be unreasonably withheld, conditioned or delayed) of the Indemnifying Person and their legal counsel, in each case provided in not more than five (5) days (or such lesser period as may be required by exigent circumstances, other than resulting from the Indemnified Person's delay) after any written request, (iv) the Indemnified Person shall endeavor, to the extent practicable, to permit active participation of the designated representatives of the Indemnifying Person and its counsel in all such matters, including, as mutually agreed by the Indemnified Person and Indemnifying Person in light of tactical considerations, providing an opportunity for attendance at or in connection with any material scheduled Proceedings, meetings (including telephonic), negotiations, conferences or otherwise, and (v) the Indemnified Person and the Indemnifying Person shall enter into a joint defense agreement as mutually agreed by such parties.[95]

---

[94] *Id.* § 10.6(b)(C).

[95] *Id.* § 10.6(c).

Broken down, Regulatory Claims under Section 10.6(c) raise five obligations, which collectively form the Participation Rights: first, the indemnified party must choose counsel to defend the Third-Party Claim (the "Choice of Counsel Obligation"); second, the indemnified party must consult regularly with the indemnifying party (the "Consultation Right"); third, the indemnified party must give the indemnifier a chance to "review and comment" on correspondences with "the applicable Government Authority" (the "Review and Comment Right"); fourth, the indemnified party must allow the Sellers to "active[ly] participat[e]" in relevant matters, which include the chance to attend "[p]roceedings, meetings[,] . . . negotiations, [and] conferences" (the "Active Participation Right"); and fifth, the parties must enter into a "mutually agreed" joint defense agreement (the "Joint Defense Obligation").[96]

Defendants concede that the Participation Rights apply to Regulatory Claims and that the DOJ Investigations are Regulatory Claims.[97] The parties dispute whether the CMS Investigation gives rise to a Third-Party Claim triggering Participation Rights.

Defendants' primary argument for why the CMS Investigation does not give rise to a Third-Party Claim relies on the concept of notice. Defendants argue that losses incurred from the CMS Investigation "will not ripen into a third[-]party claim" under Section 10.6(a) until CMS provides formal notice to Anthem that it is bringing a claim.[98] In other

---

[96] *Id.*

[97] *See* Jan. 4, 2023 Hr'g Tr. at 44:9–45:3.

[98] Defs.' Answering Br. at 39–40.

words, Defendants read Section 10.6(a) to define Third-Party Claims as requiring third party notice of a forthcoming claim.

The language of Section 10.6(a) reads, in part, "[i]f any third party shall notify any Indemnified Person with respect to any matter (a 'Third[-]Party Claim') which may give rise to a claim for indemnification against an Indemnifying Person . . . , then the Indemnified Person shall promptly notify the Indemnifying Person thereof in writing[.]"[99] Effectively, Defendants argue that the first subordinate clause referring to notice is part of the definition of Third-Party Claim.

Although Section 10.6(a) mentions notice, it does not include notice in the definition of Third-Party Claim. The parenthetical containing the defined term Third-Party Claim follows the phrase "any matter,"[100] and the phrase "any matter" exists independent of notice. Put differently, a Third-Party Claim is the "matter"; it exists irrespective of whether the third party has provided notice.

Defendants raise a second argument for why the CMS Investigation does not give rise to a ripe Third-Party Claim: there has been scant activity between Defendants and CMS. Defendants state that they merely sent two letters to CMS regarding the Coding Misconduct in April 2020 and April 2021.[101]

Defendants' description of the CMS Investigation, however, elides other activity between Defendants and the relevant regulators. In August 2021, Defendants executed the

---

[99] Purchase Agreement § 10.6(a) (underline in original).

[100] See *id.*

[101] Defs.' Answering Br. at 39.

Tolling Agreement with DOJ Civil and OIG.[102] OIG oversees CMS investigations, as CMS is a DHHS operating division.[103] That agreement waived statute of limitations, laches, or "any other time-related defense" regarding the period between June 15, 2021 and December 15, 2021.[104] The fact that Defendants entered into such a tolling agreement suggests that there is indeed a "matter" that "may give rise to a claim for indemnification" resulting from the CMS Investigation.[105]

The result is that the CMS Investigation gives rise to a Third-Party Claim. So, all three Investigations trigger Participation Rights.

## B. Defendants Breached Plaintiffs' Participation Rights.

The next issue is whether Defendants have breached their obligations to give Plaintiffs Participation Rights with respect to each Investigation.

To prevail on a claim for breach of contract, a plaintiff must prove: first, the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.[106] The breaching party's state of mind is not considered in an action for contractual breach—in that sense, liability for failure to comply with a contract is strict.[107] Liability for breach of contract

---

[102] Houston Aff., Ex. 19.

[103] *About OIG*, U.S. Department of Health & Human Services Office of Inspector General, https://oig.hhs.gov/about-oig/ (last visited April 3, 2023).

[104] Houston Aff., Ex. 19.

[105] *See* Purchase Agreement § 10.6(a).

[106] *See ATH*, 2022 WL 94610, at *6 (cleaned up).

[107] *Id.*

under common law turns on a concept of strict liability and parties are held to the standard expressed in the words of the contract.[108] If a party agrees to do something, he or she must do it or be liable for resulting damages.[109]

Plaintiffs argue that Defendants have breached its Participation Rights in connection with the DOJ Criminal Investigation in three ways.

First, Plaintiffs allege the Defendants have breached the Review and Comment Right by unilaterally responding to at least 22 subpoenas from the DOJ.[110] As evidence, the HealthSun Plaintiff attaches a grand jury subpoena and cover letter from the DOJ dated January 24, 2022, with "HealthSun20-022" in the title that was served on Anthem.[111] The subpoena offers Anthem the choice of either appearing before the grand jury or delivering subpoenaed documents to the DOJ.[112] Defendants do not deny the existence or accuracy of this information, that they responded to the grand jury subpoenas, or in what volume they received the subpoenas.[113] Nor do Defendants argue that either Plaintiff had the chance to review or comment on any responses.

---

[108] *Id.*

[109] *Id.*

[110] *See* HealthSun Action, Dkt. 187 ("HealthSun Pl.'s Reply Br.") at 17 (citing Houston Aff., Ex. 25)

[111] *See* Houston Aff., Ex. 25.

[112] *Id.* at 1.

[113] *See generally* Defs.' Answering Br.; *see also* Jan. 4, 2023 Hr'g Tr.

24

Because responses to subpoenas are "filings or written submissions with the court or [applicable] Governmental Authority[,]"[114] these subpoenas triggered the Review and Comment Right. The Purchase Agreement required Plaintiffs be given the chance to review and comment. Defendants breached by not giving them such a chance.

Second, Plaintiffs alleges that Defendants have "discussed repeatedly Anthem's self-reporting, witnesses, and the direction of the DOJ Criminal Investigation[,]" which constitutes a breach of the Active Participation Right by excluding the Sellers or their representatives.[115] The DOJ has appeared in this action and confirmed that these discussions took place.[116] Defendants excluded both Plaintiffs from these discussions. That exclusion violates the Active Participation Right, which required Defendants to "endeavor, to the extent practicable, to permit active participation of the designated representatives of the Indemnifying Person and its counsel in all such matters" relating to the Regulatory Claim.[117]

Third, Plaintiffs allege that Defendants breached the Consultation Right by not sharing information with Plaintiffs on the above-mentioned discussions.[118] The court agrees because the Consultation Right requires Buyer to "reasonably cooperate with and inform the designated representatives of the Indemnifying Person with respect to the

---

[114] Purchase Agreement § 10.6(c)(iii).

[115] HealthSun Pl.'s Reply Br. at 17.

[116] Apr. 26, 2022 Hr'g Tr. at 44:3–18 (DOJ describing the communications with Anthem as "a back and forth" that would signal "the direction of that criminal investigation.").

[117] Purchase Agreement § 10.6(c)(iv).

[118] HealthSun Pl.'s Reply Br. at 17.

conduct of the defense of [the] Regulatory Claim[.]"[119]   Defendants did not share information with Plaintiffs.

In sum, Defendants breached the Participation Rights provision in connection with the DOJ Criminal Investigation.

Plaintiffs next argue that Defendants have breached their Participation Rights in connection with the DOJ Civil Investigation in three ways, all related to the execution of the Tolling Agreement.  Defendants do not deny the factual allegations.[120]  They instead dispute that these allegations constitute a breach of the relevant provisions.

First, Plaintiffs argue that Defendants breached the Review and Comment Right by executing the Tolling Agreement and having surrounding discussions with DOJ Civil without Plaintiffs' input.[121]   Because the Tolling Agreement is a "correspondence with opposing counsel and/or the applicable Governmental Authority[,]"[122] signing the Tolling Agreement triggered the Review and Comment Right.  The Purchase Agreement required that Plaintiffs be given the chance to review and comment.  Defendants breached by not giving them such a chance.

Second, Plaintiffs argue that Defendants breached the Active Participation Right by entering into the Tolling Agreement without Plaintiffs.[123]  Because Defendants entered into

---

[119] Purchase Agreement § 10.6(c)(ii).

[120] *See generally* Defs.' Answering Br.

[121] HealthSun Pl.'s Reply Br. at 15–16.

[122] Purchase Agreement § 10.6(c)(iii).

[123] HealthSun Pl.'s Reply Br. at 16.

26

the Tolling Agreement without Plaintiffs, Plaintiffs could not participate in the defense of the DOJ Civil Investigation. Defendants breached the Active Participation Right.

Third, Plaintiffs argue that Defendants breached the Consultation Right by concealing the Tolling Agreement until February 2022, and by withholding it from Sellers until this court ordered the production of the Tolling Agreement in April 2022.[124] By concealing and/or not disclosing the existence of the Tolling Agreement, Defendants failed to "consult regularly" with the Sellers on the DOJ Civil Investigation.[125] This violated the Consultation Right.

In sum, Defendants breached Plaintiffs' Participation Rights in connection with the DOJ Civil Investigation.

Plaintiffs argue that Defendants breached the Participation Rights in connection with the CMS Investigation in four ways.

First, Plaintiffs allege that Defendants breached the Review and Comment Right by "exchanging written communications with CMS and OIG without giving the sellers notice or opportunity to comment."[126] In particular, Plaintiffs take aim at Anthem's reporting to CMS in April 2020 about the companies' "historical MRA practices" which ostensibly involved "up-coding and warranted correction."[127] Plaintiffs also point to Defendants'

---

[124] *Id.* at 15.

[125] Purchase Agreement § 10.6(c)(ii).

[126] *See id.*

[127] HealthSun Pl.'s Reply Br. at 13.

April 2021 report to CMS concerning the Coding Misconduct.[128]  Because this reporting constituted "correspondence with opposing counsel and/or the applicable Governmental Authority[,]"[129] it triggered the Review and Comment Right.  Defendants breached by not giving Plaintiffs a chance to review or comment on the written communications.

Second, Plaintiffs allege that this same activity breached the Choice of Counsel Obligation because Defendants failed to "defend the Sellers from anything."[130]  Defendants state that they retained "nationally [] recognized counsel[,]" the law firm O'Melveny & Myers LLP ("O'Melveny").[131]  The record, however, is not clear when Defendants retained O'Melveny.  If Defendants did so when they submitted the MRA practice information to CMS in April 2020, then there might not be a breach of the Choice of Counsel Obligation. The record is therefore not developed enough on this point for the court to find a breach.

Third, Plaintiffs argue that Defendants breached their Consultation Right when Defendants deleted the diagnosis codes after discovering the Coding Misconduct. Plaintiffs say the deletion was a "significant decision[]" on which Defendants failed to "reasonably cooperate with and inform the designated representatives of the Indemnifying Person[.]"[132]  Defendants state that they complied with this provision by offering Plaintiffs a "detailed explanation of the Coding Misconduct" and separately agreed to provide "the

---

[128] *Id.*

[129] Purchase Agreement § 10.6(c)(iii).

[130] HealthSun Pl.'s Reply Br. at 13.

[131] *See* Defs.' Answering Br. at 14.

[132] Purchase Agreement § 10.6(c)(ii).

full extent of [their] communications with CMS related to the Coding Misconduct . . . and a spreadsheet identifying the data corrections" subject to a confidentiality agreement with CMS and federal regulations.[133]

Defendants' deletions—without informing Plaintiffs beforehand—amount to a breach of the Consultation Right. On the one hand, Defendants have subsequently offered to "inform [Plaintiffs'] designated representatives" about the litigation and the coding deletions at issue.[134] On the other hand, however, the Consultation Right also requires Defendants to "reasonably cooperate with" Plaintiffs throughout the process.[135] That Plaintiffs only found out about the deletions and submissions to CMS after the fact reflects a failure to consult with Plaintiffs beforehand. Even if Defendants' decision to provide that information to CMS was legally or ethically correct,[136] the Consultation Right imposes additional consultation obligations.

Fourth, Plaintiffs present an additional factual theory, arguing that Defendants breached the Consultation Right failing to "reasonably cooperate with and inform" Plaintiffs about the CMS Investigation.[137] Plaintiffs state that, after submitting relevant information to CMS, Defendants failed to provide useful information to Plaintiffs "beyond

---

[133] Defs.' Answering Br. at 40.

[134] Purchase Agreement § 10.6(c)(ii).

[135] *Id.*

[136] *See* Defs.' Answering Br. at 43 (describing Plaintiffs' position to be that "Anthem should have concealed the Coding Misconduct and not corrected erroneous diagnosis coding data on file with CMS[,]" a "bad faith approach to the business, their contractual obligations[,] and their dealings with the government.").

[137] HealthSun Pl.'s Reply Br. at 14.

high-level summaries for which Anthem has withheld the underlying data."[138] Plaintiffs say the insufficiency of the corroborating evidence prevents it from "test[ing] whether Anthem's code deletions are warranted."[139] Further, Plaintiffs express skepticism that Defendants only exchanged two letters over a 29-month period with CMS—*i.e.*, Plaintiffs believe Defendants have concealed additional communications.[140] Plaintiffs also accuse Defendants of weaponizing the DOJ's motion to stay as a pretext for failing to live up to their contractual obligations.[141]

Defendants state they have agreed to provide a "detailed explanation of the Coding Misconduct[,]" the two relevant letter communications with CMS, and a spreadsheet reflecting the data corrections between January 1, 2015 and December 21, 2017, subject to an applicable confidentiality agreement with CMS and federal regulations.[142]

It is unclear whether the information offered by Defendants undermines Plaintiffs' newly developed theory of breach, or whether the additional detail would moot the theory. The motion as to this issue is denied, giving Defendants the opportunity to attempt to moot the issue.

In sum, Defendants have breached the Participation Rights with respect to the CMS Investigation, though not in every way Plaintiffs allege.

---

[138] *Id.* at 13.

[139] *Id.*

[140] *Id.* at 15.

[141] *Id.* at 14.

[142] Defs.' Answering Br. at 40.

### C. Defendants' Affirmative Defenses Do Not Foreclose Granting Summary Judgment In Favor Of Plaintiffs.

Defendants argue that two affirmative defenses foreclose summary judgment: excusal through Plaintiffs' repudiation of the Purchase Agreement, and substantial compliance with Section 10.6(c).

### 1. Repudiation

Defendants argue that Plaintiffs may not demand performance of the Participation Rights because they repudiated the Purchase Agreement by failing to indemnify Defendants.[143]   Plaintiffs counter that "the conditions to their performance have not occurred."[144]

"A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract."[145]  "Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling the other party to treat the contract as rescinded."[146]  "Repudiation of only one part of a contract will, if serious, amount to a repudiation of the whole; accordingly, a partial repudiator cannot insist on enforcing the balance of the contract."[147]

---

[143] Defs.' Answering Br. at 33 ("Having repudiated their contractual obligations, Plaintiffs are not entitled to demand any corresponding performance.").

[144] HealthSun Pl.'s Reply Br. at 23.

[145] E. Allan Farnsworth, 2 *Farnsworth on Contracts* § 8.24 at 8-195 (4th ed. 2019).

[146] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (internal quotation marks omitted).

[147] Farnsworth, *supra* § 8.24 at 8-196.

31

"In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform."[148] When a promisor repudiates a contract, the promisee may "treat the contract as terminated" either by "suspend[ing] its own performance" or "treat[ing] repudiation as a breach presently remediable by damages" and "manifest[ing] its decision to treat the contract as terminated."[149]

Defendants argue that Plaintiffs' responses to its indemnification notices, taken together, amount to joint repudiation of the Purchase Agreement.

As to the HealthSun Sellers, Defendants rely on the following communications:

- On May 13, 2020, the HealthSun Plaintiff responded to Defendants' April 16, 2020 claim notice, characterizing the claim as "improper" and stating that it "objects to the [notice of claim] in its entirety[.]"[150] The same letter also stated the HealthSun Plaintiff's position that Defendants had violated their "notice, consultation, review, comment, and participation rights."[151]

- On December 3, 2020, the HealthSun Plaintiff sent a dispute notice to the Escrow Agent regarding the claims Anthem had asserted in its November 27, 2020 claim notice. The dispute notice stated that "any and all amounts referenced" in Defendants' "Claim Notice or related to the purported Claims included therein is a Disputed Amount and, therefore, no amounts should be released from the Escrow Account to Buyer or anyone else unless and until the parties instruct otherwise through a duly executed letter agreement."[152]

---

[148] Rest. (Second) of Contracts § 250 cmt. b (Am. L. Inst. 1981).

[149] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009).

[150] Houston Aff., Ex. 14 at 1, 6.

[151] *Id.* at 3.

[152] Defs.' Answering Br., Ex. C.

Neither of these communications evidence repudiation.  In the May 13, 2020 letter, the HealthSun Plaintiff invoked its Participation Rights under the Purchase Agreement, which Defendants had breached.  The May 13 letter is therefore not an "outright refusal" to perform[153]—rather, it was an attempt to vindicate the HealthSun Plaintiff's contract rights.    Nor does the HealthSun Plaintiff's December 3 letter to the Escrow Agent constitute a repudiation.  That letter put the Escrow Agent on notice that the parties disputed the amount stated in Defendants' claim.  It did not unilaterally signal that the HealthSun Plaintiff "will not or cannot perform."[154]

As to the Pasteur Sellers, Defendants rely on the following communications:

- On April 23, 2020, the Pasteur Sellers responded to Defendants' April 16, 2020 claim notice.  In their objection letter, the Pasteur Sellers and their representative stated that they "do not agree that Anthem has properly asserted a claim or that the factual basis exists for it to do so."[155]

- On December 4, 2020, the Pasteur Plaintiff sent a separate dispute notice to Anthem and the Escrow Agent.[156]

- On December 15, 2020, the Pasteur Sellers and their representative reiterated their position in a letter to Defendants.[157]

None of these communications evidence repudiation.  In the April 23, 2020 letter, the Pasteur Sellers and their representative both challenged whether Anthem had properly asserted a claim and stated "because Anthem appears to be alleging the existence of a

---

[153] *CitiSteel USA, Inc.*, 758 A.2d at 931.

[154] Rest. (Second) of Contracts § 250 cmt. b.

[155] *See* Dkt. 97 ("Pasteur Pl.'s Opening Br."), Ex. 3.

[156] Defs.' Answering Br., Ex. D.

[157] Defs.' Answering Br., Ex. E.

Regulatory Claim . . . , Anthem has an obligation to comply with all provisions of Section 10.6(c)[.]"[158] The Pasteur Plaintiff's December 4, 2020 dispute notice letter informed the Escrow Agent of the parties' dispute and told it to withhold any releases "until the parties instructed otherwise[.]"[159] So, like the HealthSun Plaintiff's December 3, 2020 letter to the Escrow Agent, the Pasteur Plaintiff's December 4, 2020 letter does not constitute a repudiation. Finally, the Pasteur Plaintiff's December 15, 2020 letter "once again remind[s] Anthem of its obligation under Section 10.6(c) of the parties' Equity Interests Purchase Agreement."[160] Much like the HealthSun Plaintiff's communications, the Pasteur Sellers' communications constitute effort to vindicate contract rights, not to repudiate.

In sum, Defendants' defense of excusal through repudiation fails because neither the HealthSun Plaintiff nor the Pasteur Plaintiff repudiated the Purchase Agreement.

### 2. Substantial Compliance

Defendants next argue that they have substantially complied with the Purchase Agreement in all material respects. Although this argument is primarily directed at the Pasteur Plaintiff, in their briefing, Defendants seem to raise it more generally as to both Plaintiffs.[161] Plaintiffs counter that the appropriate standard is strict rather than substantial

---

[158] *Id.*

[159] Defs.' Answering Br., Ex. C at 1.

[160] Defs.' Answering Br., Ex. E.

[161] Defs.' Answering Br. at 35–39.

compliance—so the court need not assess the materiality of any breach to enter declaratory judgment on Count I.[162]

The parties did not meaningfully brief the question of which standard of breach applies—substantial compliance or strict. The limited authorities cited by the parties do not fully support their respective positions.[163]

To streamline this decision, the court assumes that the standard is substantial compliance. Under that standard, Defendants still lose. Delaware follows the Restatement

---

[162] HealthSun Pl.'s Reply Br. at 19–20.

[163] Defendants cite to a number of authorities in support of their substantial compliance argument. *See* Defs.' Answering Br. at 37 (citing *In re Eagle-Picher Indus., Inc.*, 285 F.3d 522 (6th Cir. 2002), *In re Mobilactive Media*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013)). For instance, Defendants rely on *In re Mobilactive Media, LLC*, where the court observed that "[a] party is excused from performance under a contract if the other party is in material breach thereof[.]" 2013 WL 297950, at *13 (internal quotation marks omitted). It is unclear whether those authorities are relevant where, as here, the plaintiff does not seek to suspend its own performance because of Defendants' breach. Defendants also analogize to a pair of cases in which courts permitted persons to substantially and not literally comply with contractual notice requirements and federal statute, respectively. *See* Defs.' Answering Br. at 37 (citing *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *8 (Del. Ch. June 5, 2006), *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 651–652 (E.D. Pa. 2017)). Both cases are distinguishable. In *Gildor*, the court chided the defendants for failing to take "reasonable steps" to provide "actual notice" to the stockholder where "literal compliance" with the contractual notice provision was impossible. In *Sessions*, the court reasoned that a substantial compliance concept rooted in contract law motivated the design of a statutory scheme. Neither case supports Defendants' argument in these circumstances. Plaintiffs' cited authority is similarly unpersuasive. Plaintiffs cite to a decision of this court stating that "liability for failure to comply with a contract is strict." *See ATH*, 2022 WL 94610, at *6 (quoting *Lacey v. Mota-Velasco*, 2021 WL 508982, at *8 (Del. Ch. Feb. 11, 2021)); *see also* HealthSun Pl.'s Opening Br. at 41 (quoting same). But that statement is taken out of context. The court used the phrase "strict liability" to distinguish contractual liability from negligence or other standards that require peering into a party's state of mind. The court did not address the remedies available for a non-breaching party when faced with a breach of questionable materiality.

35

(Second) of Contracts for determining materiality in the substantial compliance context.[164]

Under the Restatement (Second),

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[165]

This standard is "necessarily imprecise and flexible" and must be "applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances."[166]

Here, the HealthSun Plaintiff has been "deprived of the benefit which [it] reasonably expected"[167]—namely, the ability to participate in the defense of the Investigations. And because this benefit is intangible, it is hard to imagine how to "adequately compensate[]"

---

[164] *See, e.g.*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *13; *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (citing Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)).

[165] Restatement (Second) of Contracts §§ 241, 241(a)–(e).

[166] *Id.* § 241 cmt. a.

[167] *Id.* §§ 241, 241(a).

the HealthSun Plaintiff for the breach.[168]  Under the circumstances, these factors weigh in favor of a finding of materiality.

Defendants advance five arguments in favor of a finding of immateriality.  First, Defendants argue that "any consultation right would be limited to offering views" and that, even if participating in the litigation, "Plaintiffs have no right to dictate strategy."[169]  But this framing reduces the Participation Rights—which include a Review and Comment Right process and an Active Participation Right[170]—to consultation exclusively.  Although Plaintiffs do not have the autocratic authority to dictate strategy *per se* over Regulatory claims, to exercise Participation Rights, one need not do so.  Plaintiffs were entitled to a seat at the table, which they did not receive.

Second, Defendants state that Plaintiffs have retained separate criminal counsel and have been communicating directly with DOJ Criminal—*i.e.*, that they have received the opportunity to participate in that Third-Party Claim.[171]  Defendants state that Plaintiffs have not consulted with Defendants about their own interactions with DOJ Criminal or otherwise "disclosed any information about that participation[.]"[172]

This argument does not address the materiality of any breach on Defendants' part.  Section 10.6(c) imposes an obligation on Defendants, as the "Indemnified Person[s]," to

---

[168] *Id.* §§ 241, 241(b).

[169] Defs.' Answering Br. at 49.

[170] Purchase Agreement §§ 10.6(c)(iii), (iv).

[171] Defs.' Answering Br. at 50.

[172] *Id.*

37

let the Sellers or their representatives participate in the defense of Regulatory Third-Party Claims.[173] That obligation did not flow both ways—*i.e.*, Section 10.6(c) does not impose any such obligation on the Indemnifying Person to consult with the Indemnified on their own, separate defense. Although perhaps that result creates lopsided obligations, it is what the parties agreed.

Third, Defendants state that they have complied with obligations to defend the Third-Party Claims with nationally recognized counsel, specifically, O'Melveny & Myers LLP, in compliance with the Choice of Counsel Obligation.[174] This point fails because Defendants' compliance with this provision does not address potential breaches elsewhere or the materiality of those breaches.

Fourth, Defendants argue that Plaintiffs' failure to contact them to ask for a joint defense agreement under the Joint Defense Obligation fails to trigger the remaining Participation Rights.[175] The Joint Defense Obligation provides that "the Indemnified Person and the Indemnifying Person shall enter into a joint defense agreement as mutually agreed by such parties."[176]

This argument fails for several reasons. For one, the Joint Defense Obligation does not impose an affirmative duty on the indemnifying persons to contact the indemnified persons to put a joint defense agreement in place. The Joint Defense Obligation says the

---

[173] *See* Purchase Agreement § 10.6(c).

[174] Defs.' Answering Br. at 51.

[175] *Id.*

[176] Purchase Agreement § 10.6(c)(v).

38

parties shall "mutually agree[]" on a joint defense agreement—suggesting that neither party alone bears the burden of first contact. So, Plaintiffs' failure to propose a joint defense agreement proactively does not necessarily absolve Defendants of their own obligation to work with the HealthSun Plaintiff to get one in place.

For another, the structure of Section 10.6(c) indicates that the Joint Defense Obligation is not a trigger condition for the rest of the Participation Rights. Generally, Section 10.6(c) creates a set of five parallel obligations, which are iterated in subsections (i) through (v). Had the parties wanted the Joint Defense Obligation to be a threshold to other Participation Rights iterated in Section 10.6(c), they could have used much clearer language to that effect. Instead, Section 10.6(c) ascribes free-standing significance to each Participation Right. It is therefore not apparent how a joint defense agreement's failure to materialize makes up for Defendants denying Plaintiffs other Participation Rights.

Fifth, Defendants argue that "many of the events for which consultation rights would be triggered . . . have not occurred," including defenses, motions, offers of settlement, or the like.[177] Although many situations in which the Participation Rights apply are not applicable here, this point does not address why Defendants' breach should be considered immaterial.

In sum, even if the court analyzed the issue of breach using a substantial compliance framework, the undisputed facts still demonstrate a material breach of the Participation Rights provision.

---

[177] Defs.' Answering Br. at 51–52.

39

### D. Plaintiffs Are Entitled To Fee-Shifting.

Plaintiffs seek attorneys' fees based on Section 10.4 of the Purchase Agreement, which this court previously held "permits the sellers to recover fees on a claim-by-claim basis."[178]

Section 10.4 of the Purchase Agreement states that the Buyer agrees to "indemnify [Plaintiffs] . . . against, and agrees to hold each of them harmless from, any and all Losses incurred or suffered by them incident to, resulting from or in any way arising out of or in connection with any breach or inaccuracy of a representation or warranty[.]"[179] The Purchase Agreement defines "Losses" to include "all assessments, losses, penalties, fines, damages, Liabilities, deficiencies, Taxes, debts, charges, costs or expenses, including interest, and *court costs and reasonable attorneys' fees, costs, and expenses incurred . . . with respect to asserting or enforcing its rights under this Agreement*[.]"[180]

Because the court has already determined that Defendants are in breach, the critical issue is whether legal fees from bringing the action for declaratory judgment count as "Losses" under the Purchase Agreement. In the January 10, 2022 decision, this court determined that legal fees under the Purchase Agreement do count as such, to the extent they were incurred to enforce Plaintiffs' rights regarding the release of escrow funds. Similarly, here, both Plaintiffs has incurred legal expenses in connection with their motions

---

[178] HealthSun Pl.'s Opening Br. at 43 (quoting *ATH*, 2020 WL 7706937, at *15); *see also ATH*, 2022 WL 94610, at 4 (stating same).

[179] Purchase Agreement § 10.4.

[180] *Id.*, Ex. A at A–13 (emphasis added).

to enforce their Participation Rights. Those legal expenses therefore also count as Losses to which Section 10.4 applies.

Defendants do not meaningfully dispute that Plaintiffs are entitled to fee-shifting if Defendants are found to have breached the Purchase Agreement. They half-heartedly argue that Plaintiffs should not receive fees on an interim basis. The court disagrees. Plaintiffs are entitled to fees in connection with the portions of their claims on which they prevailed.

### E. Plaintiffs Are Not Entitled To Escrow Relief.

The Pasteur Plaintiff argues that Defendants' contractual breaches nullify Defendants' instruction to the Escrow Agent in November 2020 to withhold the release of the approximately $20 million remaining in escrow. Therefore, the Pasteur Plaintiff asks the court to grant the release of the remaining funds and shift fees in its favor.[181] Defendants assert a variety of arguments in response, but the court need only address one—that the escrow funds should not be released because Defendants' outstanding first-party claims against the escrowed funds exceed the escrow amount.[182]

Section 10.3(a) of the Purchase Agreement requires Plaintiffs to indemnify Defendants for

> any and all Losses sustained, incurred or suffered by any of them incident to, resulting from or in any way arising out of or in connection with . . . [a]ny breach or inaccuracy . . . of any representation or warranty applicable to the Companies . . . or

---

[181] *See id.* at 1–5.

[182] Defs.' Answering Br. at 4–5.

any breach of any covenant or agreement applicable to the Companies[.][183]

Defendants assert that Plaintiffs have breached representations in the Purchase Agreement relating to their compliance with relevant healthcare laws and requirements imposed by government authorities.[184] Defendants have also asserted a first-party claim against the escrow funds in addition to the Third-Party Claims addressed in this decision, and they estimate that the amount of damages will exceed the total amount of the funds in escrow.[185]

The court has not yet resolved the validity of Defendants' first-party claim or assessed the damages Defendants might recover for that claim. Therefore, release of the remaining escrow funds would be premature.

The Pasteur Plaintiff reads this court's December 2020 decision to foreclose Defendants from laying claim to escrow funds unless in compliance with the entirety of Article 10 of the Purchase Agreement.[186] In particular, the Pasteur Plaintiff quotes a portion of the court's analysis stating that Section 10.3—which creates the indemnity obligations at issue—is "[s]ubject to the provisions set forth in this Article 10[.]"[187] Extending this statement beyond the context in which it was made, the HealthSun Plaintiff

---

[183] Purchase Agreement §§ 10.3, 10.3(a).

[184] *See* Defs.' Answering Br. at 29 (citing Purchase Agreement §§ 2.13(e), (g), (l), (m)).

[185] *See* Defs.' Answering Br. at 29–30.

[186] Pasteur Pl.'s Reply Br. at 11–12.

[187] *See id.* at 11–12 (citing *ATH*, 2020 WL 7706937, at *11) (quoting Purchase Agreement § 10.3).

argues that a breach of the Participation Rights (also contained in Article 10) effects a breach of Article 10 more generally, cancels the Sellers' indemnification obligation, and requires the release of the escrow funds.

Although it is true that Section 10.3 is subject to the rest of Article 10, a breach of obligations relating to Third-Party Claims does not necessarily do away with the pending first-party claim. The court has not yet assessed the merits of that first-party claim and cannot do so today on the limited record before it.

The Pasteur Plaintiff's request for the release of the escrow funds is therefore denied.

## III.    CONCLUSION

Plaintiffs' motions for summary judgment are granted, except as to the Pasteur Plaintiff's request for escrow relief. Plaintiffs shall prepare a revised form of order implementing this decision within ten days, providing Defendants at least five days to review the form.

As a separate matter, the court notes that the passage of time may have mooted the need for guidance to the parties regarding the *in camera* inspection or this court's ultimate decision on a discovery stay extension. The parties and the United States shall confer and advise the court on whether they need additional guidance on this point.

43